IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-112

Filed 20 August 2024

Lenoir County, No. 23 JA 34

IN THE MATTER OF: K.C.

Appeal by Respondent-Mother from order entered 24 October 2023 by Judge Beth Heath in Lenoir County District Court. Heard in the Court of Appeals 14 May 2024.

*Jeffrey L. Miller, for Respondent-Mother.*

*Sonya Davis, for Respondent-Father, no brief filed.*

*Robert Griffin, for Petitioner-Appellee Lenoir County Department of Social Services.*

*Winston & Strawn, LLP, by Stacie C. Knight, for the Guardian Ad Litem.*

CARPENTER, Judge.

Respondent-Mother appeals from an order (the "Order") adjudicating the juvenile, Ken,[1] neglected within the meaning of N.C. Gen. Stat. § 7B-101(15) and granting temporary custody of Ken to the Lenoir County Department of Social Services ("DSS"). On appeal, Respondent-Mother argues the trial court erred in adjudicating Ken as a neglected juvenile. After careful review, we affirm the Order.

**I. Factual & Procedural Background**

---

[1] A pseudonym is used to protect the juvenile's identity and for ease of reading. *See* N.C. R. App. P. 42(b).

Ken was born in August of 2022 to Respondent-Mother and Father, who were and remain an unmarried couple. On 19 May 2023, DSS filed its juvenile petition. The petition alleged that Ken was a neglected juvenile due to a positive meconium test, unsuccessful attempts by DSS to engage Respondent-Mother in substance-abuse treatment, a lack of response from Respondent-Mother to texts and calls from DSS, and multiple missed medical appointments regarding Ken's health issues. That same day, the trial court signed an order for nonsecure custody, placing Ken under temporary DSS custody. On 18 September 2023, the trial court conducted the adjudication hearing. Respondent-Mother appeared with counsel, and the evidence tended to show the following.

At Ken's birth, Respondent-Mother's urine screen was positive for amphetamines. Ken's meconium screening, which tested Ken's first bowel movement, was positive for amphetamines and methamphetamine. On 9 August 2022, DSS began its involvement with Ken, Respondent-Mother, and Father due to Respondent-Mother's positive urine screen and Ken's positive meconium test. DSS regularly communicated, or made unsuccessful attempts to communicate, with Respondent-Mother and Father, attempted to engage Respondent-Mother in substance-abuse treatment, and assisted Respondent-Mother with transportation to some of Ken's necessary medical appointments.

Soon after his birth, Ken developed health conditions—including jaundice, an abscess, a hernia, and MRSA—which required medical care in addition to his

wellness checks. On 8 August 2022, Respondent-Mother took Ken to the doctor for jaundice, but then cancelled a newborn visit on 9 August 2022 and no-showed for a sick-newborn recheck on 10 August 2022. On 11 August 2022, Respondent-Mother took Ken to the doctor for a well-child visit. On 15 August 2022, Respondent-Mother took Ken to the doctor for a walk-in appointment due to concerns over his deep sleep, jaundiced color, and white patches on his tongue. She then cancelled a weight check on 18 August 2022 and no-showed two weight checks on 19 and 20 August 2022.

A month later, Respondent-Mother took Ken to the doctor for: concerns regarding formula intolerance, thrush, nasal congestion, coughing, and sneezing on 16 September 2022; a diaper rash on 26 September 2022; and a hernia on 4 October 2022. Respondent-Mother then cancelled an ultrasound appointment for the hernia on 7 October 2022 before completing the ultrasound on 11 October 2022. Afterward, she missed an appointment with the surgical center for Ken's hernia and cancelled twice before meeting with the surgical center on 2 November 2022. Respondent-Mother cancelled a follow-up surgical appointment on 8 November 2022 and a well-child visit at the clinic on 11 November 2022.

On 8 December 2022, Respondent-Mother took Ken to the doctor regarding an abscess on his buttocks. Afterward, she cancelled a well-child visit, a surgical appointment for the hernia, and a checkup for the abscess. On 19 December 2022, Respondent-Mother attended a checkup for Ken's abscess, but cancelled a well-child visit and two checkups for Ken's cough and congestion afterward. On 6 February

2023, she took Ken to the doctor for a positive COVID test but subsequently cancelled two well-child visits.

On 23 February 2023, Respondent-Mother took Ken for his five-month well-child visit when he was six months old. Then she cancelled two follow-up appointments regarding Ken's cough and no-showed a surgical appointment regarding Ken's hernia. Respondent-Mother took Ken for a well-child visit on 24 April 2023, a sick visit regarding seizure activity and MRSA on 9 May 2023, a diagnostic neurological visit for MRSA on 10 May 2023, and a visit for hernia removal on 11 May 2023. Afterward, she cancelled a well-child visit on 26 June 2023 and a urology visit on 29 June 2023. In sum, as of 30 June 2023, Respondent-Mother failed to attend twenty-four out of forty-one medical appointments for Ken.

Respondent-Mother denied any substance use after discovering she was pregnant with Ken at eighteen weeks. She also claimed DSS did not request substance-abuse and mental-health assessments until December 2022. Respondent-Mother did not obtain a mental-health assessment until the week before the adjudication hearing due to issues with insurance, and she never completed a substance-abuse assessment due to having "a lot going on." Respondent-Mother then said she "did not recall" the missed appointments or claimed she only rescheduled or postponed them to a later date. She had difficulty arranging transportation without her own car, despite qualifying for Medicaid and its transportation services, and

obtained transportation from her mother, friend, social worker, and EMS when necessary.

In the Order, the trial court made the following findings of fact within Finding 11, in pertinent part:

> [t]he minor child's meconium tested positive for amphetamines and methamphetamines at birth
> . . . .
> Respondent Mother has no explanation as to why the minor child's meconium was positive for methamphetamine and amphetamines
> . . . .
> Many of those appointments were no shows and cancellations because of issues with transportation
> . . . .
> Respondent Mother was requested to complete a mental health assessment and substance abuse assessment; however, Respondent Mother has not submitted to a mental health assessment and/or substance abuse assessment, until submitting to a mental health assessment on the last business day prior to the trial of this matter, more than one year from the birth of the minor child . . . .

Based on these findings, the trial court concluded Ken was a neglected juvenile. A disposition hearing followed the trial court's adjudication decision, and the trial court entered an initial disposition order. On 17 November 2023, Respondent-Mother timely appealed from the Order. Father did not appeal.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. §§ 7A-27(b)(2), 7B-1001(a)(3) (2023).

### III.  Issue

The issue on appeal is whether the trial court erred in adjudicating Ken as a neglected juvenile.

### IV.  Analysis

On appeal, Respondent-Mother challenges the trial court's adjudication of Ken as a neglected juvenile.  Specifically, Respondent-Mother argues that her attempts to obtain substance-abuse and mental-health assessments, coupled with the fact that she provided Ken with necessary medical care, do not constitute neglect, since a positive meconium test alone is not enough to sustain an adjudication of neglect.  Conversely, DSS argues that Respondent-Mother did not provide proper care for Ken, had not provided or arranged necessary medical care, and allowed the creation of an environment that was injurious to Ken's welfare.  We agree with DSS.

#### A. Standard of Review

"When reviewing a trial court's order adjudicating a juvenile abused, neglected, or dependent, this Court's duty is 'to determine (1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by findings of fact.'" *In re F.C.D.*, 244 N.C. App. 243, 246, 780 S.E.2d 214, 217 (2015) (quoting *In re T.H.T.*, 185 N.C. App. 337, 343, 648 S.E.2d 519, 523 (2007)).  "It is well settled that in a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are

deemed conclusive, even where some evidence supports contrary findings." *In re J.A.M.*, 372 N.C. 1, 8, 822 S.E.2d 693, 698 (2019) (*purgandum*).

"The clear and convincing standard requires evidence that 'should fully convince.'" *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 721, 693 S.E.2d 640, 643 (2009) (quoting *In re Will of McCauley*, 356 N.C. 91, 101, 565 S.E.2d 88, 95 (2002)). "This burden is more exacting than the preponderance of the evidence standard generally applied in civil cases, but less than the beyond a reasonable doubt standard applied in criminal matters." *Id.* at 721, 693 S.E.2d at 643 (citing *Williams v. Blue Ridge Bldg. & Loan Ass'n*, 207 N.C. 362, 363–64, 177 S.E. 176, 177 (1934)).

Findings of fact are binding if they are not challenged on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). When reviewing findings of fact in a juvenile order, we set aside findings that lack sufficient evidentiary support and examine whether the remaining findings support the trial court's determination. *In re A.J.L.H.*, 384 N.C. 45, 52, 884 S.E.2d 687, 693 (2023).

The determination of whether a child is abused, neglected, or dependent is a conclusion of law. *In re Ellis*, 135 N.C. App. 338, 340, 520 S.E.2d 118, 120 (1999). We review the trial court's conclusions of law de novo. *In re K.S.*, 380 N.C. 60, 65, 868 S.E.2d 1, 9 (2022) (citing *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019)). Under a de novo review, this Court "'considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628,

632–33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen, Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

**B. Adjudication of Neglect**

We have a two-step process for abuse and neglect proceedings: an adjudicatory stage and a dispositional stage. *In re K.W.*, 272 N.C. App. 487, 493, 846 S.E.2d 584, 589 (2020). "If the trial court finds at adjudication that the allegations in a petition have been proven by clear and convincing evidence and concludes based on those findings that a juvenile is abused, neglected, or dependent, the court then moves on to an initial disposition hearing." *Id.* at 493, 846 S.E.2d at 589 (citing N.C. Gen. Stat. § 7B-901 (2019)). At the dispositional stage, "the trial court, in its discretion, determines the child's placement based on the best interests of the child." *Id.* at 493, 846 S.E.2d at 589. As Respondent-Mother's appeal is limited to the adjudication phase, we focus our review on the adjudication portion of the Order.

The Juvenile Code defines a neglected juvenile as "[a]ny juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker does any of the following:"

> a. Does not provide proper care, supervision, or discipline.
> b. Has abandoned the juvenile, except where that juvenile is a safely surrendered infant as defined in this Subchapter.
> c. Has not provided or arranged for the provision of necessary medical or remedial care.
> d. Or whose parent, guardian, or custodian has refused to follow the recommendations of the Juvenile and Family Team made pursuant to Article 27A of this Chapter.

e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.
f. Has participated or attempted to participate in the unlawful transfer of custody of the juvenile under [N.C. Gen. Stat. §] 14-321.2.
g. Has placed the juvenile for care or adoption in violation of law.

N.C. Gen. Stat. § 7B-101(15) (2023).

Before adjudicating a juvenile neglected, the trial court must also find "some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide 'proper care, supervision, or discipline.'" *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (quoting *In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901–02 (1993)). With newborns, "the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999). The Supreme Court of North Carolina has found neglect in cases where "the conduct at issue constituted either severe or dangerous conduct or a pattern of conduct either causing injury or potentially causing injury to the juvenile." *In re Stumbo*, 357 N.C. at 283, 582 S.E.2d at 258.

"[T]he clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile." *In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698 (2019). But "[t]he trial court is granted some discretion in determining whether children are at risk for a particular kind of harm given their

age and the environment in which they reside." *In re A.D.*, 278 N.C. App. 637, 642, 863 S.E.2d 317, 321–22 (2021) (internal quotations and citation omitted). "It is well-established that the trial court need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home." *In re D.B.J.*, 197 N.C. App. 752, 755, 678 S.E.2d 778, 780 (2009).

As such, a trial court can consider evidence of a parent's mental health and substance-abuse issues. *See In re C.C.*, 260 N.C. App. 182, 191–94, 817 S.E.2d 894, 900–01 (2018). Mental health issues, which are a "fixed and ongoing circumstance," can lead to an adjudication of neglect. *In re G.W.*, 286 N.C. App. 587, 594, 882 S.E.2d 81, 88 (2022) (citing *In re Q.M.*, 275 N.C. App. 34, 41, 852 S.E.2d 687, 693 (2020) and *In re V.B.*, 239 N.C. App. 340, 344, 768 S.E.2d 867, 870 (2015)). Findings that "show a prolonged period of drug use in the home" which pose a substantial risk of harm to a child can support an adjudication of neglect. *See In re K.H.*, 281 N.C. App. 259, 270, 867 S.E.2d 757, 765 (2022).

**1. Meconium Test**

On appeal, Respondent-Mother does not challenge the finding of fact that Ken's meconium test, taken shortly after his birth, was positive for amphetamines and methamphetamine. Thus, the results of the meconium test are binding on appeal. *See Koufman,* 330 N.C. at 97, 408 S.E.2d at 731.

A positive meconium test alone, however, is not sufficient to support an adjudication of neglect. *See In re D.S.*, 286 N.C. App. 1, 16, 879 S.E.2d 335, 346 (2022)

("[T]here [must be] additional adjudicatory evidence showing [the child] was at any further risk of harm from Mother's prior drug use after she was discharged from the hospital . . . ."). Rather, "the trial court must find that there were 'current circumstances' that rendered [the child's] environment unsafe." *Id.* at 16, 879 S.E.2d at 346 (citing *In re G.C.*, 284 N.C. App. 313, 318, 876 S.E.2d 95, 99 (2022), *rev'd on other grounds*, 384 N.C. 62, 884 S.E.2d 658 (2023)).

**2. Health Assessments**

Health assessments of a parent can help the trial court determine the "current circumstances" of a child's environment. *See id.* at 16, 879 S.E.2d at 346; N.C. Gen. Stat. § 7B-101(15)(e). This is especially true with newborns, when "the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case" and make a decision that is "predictive in nature." *See In re McLean*, 135 N.C. App. at 396, 521 S.E.2d at 127.

Here, Respondent-Mother disputes the timeliness of DSS's requests for her health assessments, arguing that DSS only notified her of its request for a substance-abuse assessment in December 2022, and that she consistently attempted to get a mental-health assessment. We disagree.

First, after a positive drug screen at Ken's birth, Respondent-Mother never completed a substance-abuse assessment. Respondent-Mother's drug use during pregnancy posed "a substantial risk of harm" to Ken. *See In re K.H.*, 281 N.C. App. at 270, 867 S.E.2d at 765. Thus, a substance-abuse assessment after Ken's meconium

- 11 -

results and Respondent-Mother's positive urine screen was necessary for the trial court to assess the "current circumstances" of Ken's environment.  *See In re D.S.*, 286 N.C. App. at 16, 879 S.E.2d at 346.

Second, Respondent-Mother did not timely obtain a mental-health assessment before the September 2023 adjudication hearing.  Respondent-Mother's mental health issues are a "fixed and ongoing circumstance," *see In re G.W.*, 286 N.C. App. at 594, 882 S.E.2d at 88, that pose a "substantial risk of harm" to Ken, *see In re K.H.*, 281 N.C. App. at 270, 867 S.E.2d at 765.  Thus, this information is relevant for a trial court to render a decision "predictive in nature" regarding the child's environment. *See In re McLean*, 135 N.C. App. at 396, 521 S.E.2d at 127.

Respondent-Mother's failure to complete the substance-abuse assessment and timely complete the mental-health assessment is clear and convincing evidence tending to support a substantial risk of future neglect.  *See id.* at 390, 521 S.E.2d at 123.  Without these assessments, Respondent-Mother cannot get the proper treatment for the "fixed and ongoing" issues, *see In re G.W.*, 286 N.C. App. at 594, 882 S.E.2d at 88, that impact her ability to provide adequate care for Ken, *see* N.C. Gen. Stat. § 7B-101(15).  Thus, because of Ken's positive meconium test and Respondent-Mother's positive urine screen, coupled with her failure to take substance-abuse and mental-health assessments, the trial court appropriately determined that "there [was] a substantial risk of future abuse or neglect of [Ken] based on the historical facts of the case."  *See In re McLean*, 135 N.C. App. at 396, 521 S.E.2d at 127.

**3. Medical Appointments**

Respondent-Mother also contests the trial court's finding of fact that she missed "many" of Ken's medical appointments. Although she concedes she did miss "some" of Ken's medical appointments, she argues that these appointments were merely "rearranged" due to transportation issues, which is not enough to show neglect in providing necessary medical treatment. We disagree.

Despite Ken's health concerns, including a hernia that needed surgical removal, an abscess, and MRSA, Respondent-Mother failed to attend twenty-four out of forty-one appointments due to cancellations and no-shows, all within the first year of Ken's life. When an infant has substantial health concerns, sporadically attending necessary medical appointments and procedures can pose a "substantial risk" of harm. *See In re J.G.B.*, 177 N.C. App. 375, 380–81, 628 S.E.2d 450, 454–55 (2006) (finding that attending some but not all medical appointments can lead to an adjudication of neglect); *see also In re J.N.J.*, 286 N.C. App. 599, 616, 881 S.E.2d 890, 902 (2022) (adjudicating a medically fragile infant as neglected when parents did not provide all necessary medical equipment); *In re S.W.*, 187 N.C. App. 505, 507, 653, S.E.2d 425, 426 (2007) (affirming an adjudication of neglect where respondents allowed the juvenile's four broken ribs to go untreated for up to eight weeks).

By missing a substantial number of Ken's necessary medical appointments, Respondent-Mother failed to provide necessary medical care. *See In re F.C.D.*, 244 N.C. App. at 246, 780 S.E.2d at 217. For example, when Ken needed a hernia

removed, Respondent-Mother cancelled or no-showed several surgical appointments. This is "clear and convincing evidence" that Respondent-Mother did not arrange necessary medical care for Ken. *See id. at* 246, 780 S.E.2d at 217.

Respondent-Mother failed to provide Ken with proper care by not ensuring his attendance for necessary medical appointments, not completing the substance-abuse assessment, and not timely completing the mental-health assessment. *See* N.C. Gen. Stat. § 7B-101(15)(a), (c). This evidence, in combination with the unchallenged finding of fact that Ken's meconium test was positive for amphetamines and methamphetamine, *see Koufman,* 330 N.C. at 97, 408 S.E.2d at 731, fully convinces that Ken's environment was injurious to his welfare, *see Scarborough*, 363 N.C. at 721, 693 S.E.2d at 643; N.C. Gen. Stat. § 7B-101(15)(e). Thus, the trial court correctly determined that Ken faced a substantial risk of future neglect based on the historical facts of the case. *See In re McLean,* 135 N.C. App. at 396, 521 S.E.2d at 127.

Based upon the foregoing, the trial court's findings of fact were supported by clear and convincing evidence, and its conclusions were supported by those findings of fact. *See In re F.C.D.*, 244 N.C. App. at 246, 780 S.E.2d at 217. Accordingly, the trial court did not err in adjudicating Ken as a neglected juvenile. *See* N.C. Gen. Stat. § 7B-101(15).

## V. Conclusion

We hold that the trial court did not err in adjudicating Ken as a neglected juvenile. The trial court made sufficient findings of fact supported by clear and

convincing evidence relating to the current circumstances of Respondent-Mother, which show a substantial risk of future neglect to Ken. The findings in turn support the conclusion of law that Ken is a neglected juvenile.

AFFIRMED.

Judges TYSON and MURPHY concur.